## UPTOWN CLUB OF MANHATTAN, Inc., v. UNITED STATES.

### No. 48209.

United States Court of Claims.
May 2, 1949.

HOWELL and LITTLETON, Judges, dissenting.

Joseph R. Shaughnessy, of New York City (Allin, Riggs & Shaughnessy and William Klemm Stewart, all of New York City, on the brief), for plaintiff.

Joseph H. Sheppard, of Washington, D. C., and Theron Lamar Caudle, Asst. Atty. Gen. (Andrew D. Sharpe and A. F. Prescott, both of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Judge, and MADDEN, WHITAKER, HOWELL and LITTLETON, Judges.

JONES, Chief Judge.

The issue is whether the plaintiff is a social club or organization within the meaning of Section 1710[1] of the Internal Revenue Code, as amended, 26 U.S.C.A. § 1710.

Pursuant to a ruling of the Collector of Internal Revenue that the plaintiff is a social club, taxes were collected from the members on dues and initiation fees paid by the members to the club from February 1943 to September 30, 1947. These taxes were then paid by the club to the defendant. On behalf of the members who signed powers of attorney this suit for a refund has been filed.

The facts are set out in the findings.

The regulations of the Treasury Department, Treasury Regulations 43, secs. 101.24 and 101.25, are to the effect that if the social features are a material purpose of the organization it is a social club, subject to the tax, but if such features are subordinate and incidental to the furtherance of a different and predominant purpose such as religion, the arts or business, etc., it is not subject to the tax.

The courts have uniformly followed this test. There have been a great many decisions practically all of which apply the same test. The law itself appears to be well settled.

But when it comes to determining the classification in which a club falls, there has been considerable difference of opinion. The differences are in the main factual. No two clubs are exactly the same. They differ widely in their purposes and practices. Each must be decided on its own facts.

---

[1] "Sec. 1710. Tax.

"(a) [As amended by Section 543(a) of the Revenue Act of 1941, c. 412, 55 Stat. 687] Rate. There shall be levied, assessed, collected, and paid—

"(1) *Dues or membership fees.* A tax equivalent to 11 percentum of any amount paid as dues or membership fees to any social, athletic, or sporting club or organization, if the dues or fees of an active resident annual member are in excess of $10 per year.

"(2) *Initiation fees.* A tax equivalent to 11 per centum of any amount paid as initiation fees to such a club or organization, if such fees amount to more than $10, or if the dues or membership fees, not including initiation fees, of an active resident annual member are in excess of $10 per year. * * *

"(b) *By whom paid.*—The taxes imposed by subdivision (a) shall be paid by the person paying such dues or fees, or holding such life membership." 26 U.S.C.A. § 1710.

"Sec. 1712. Definitions.

"As used in this subchapter—

"(a) [As amended by Section 543(b) of the Revenue Act of 1941, supra] *Dues.* The term 'dues' includes any assessment, irrespective of the purpose for which made, and any charges for social privileges or facilities, or for golf, tennis, polo, swimming, or other athletic or sporting privileges or facilities, for any period of more than six days; * * *". 26 U.S.C.A. § 1712.

[Effective April 1, 1944, the rate of tax was increased to 20 per centum, 26 U.S. C.A. § 1650.]

Some of the cases in which clubs have been held taxable [2] by this and other courts are shown in the footnote, also a partial list of clubs held not taxable.[3]

The district and circuit courts, as well as this court, while recognizing the same principle of law, have held on the facts presented certain clubs subject to the tax and others not subject to the tax, dependent upon whether the social features were found to have been a material part of the club's purposes.

█ The plaintiff cites our opinion in the case of Merchants Club v. United States, 66 F.Supp. 126, 106 Ct.Cl. 562, in which we held that eating as such is not a social activity. We adhere to that viewpoint. But neither is it a business activity. People eat whether at work or at play.

We must look beyond this to determine the predominant purpose of a club. The setting and circumstances of the meal and other features may have a bearing on the nature of a club's activities.

█ Aside from the question of the breakfast and lunch we can find no predominant business purpose in the Uptown Club in connection with which its social activities could be classed as incidental. On the other hand most of its activities that could be classified at all were more of a social nature than otherwise.

The facts of the instant case are clearly distinguishable from the facts in the Merchants Club case, supra. We quote from the latter case, 66 F.Supp. at page 128, 106 Ct.Cl. at page 576: " * * * the Merchants Club is lacking in many social features found in many luncheon clubs. It is a luncheon club primarily for cotton textile merchants. It provides a place to eat lunch in a district containing no satisfactory public restaurants and it serves as semiofficial headquarters for the selling end of the cotton textile industry. `There being no exchange for the marketing of cotton textiles the club is a sort of clearinghouse of information for that industry. It is open only in the daytime. It is closed on all holidays, Saturdays, and Sundays. Many official meetings and conferences are held there and office and technical problems discussed. Since its organization in 1871, over a period of nearly seventy-five years, no games have ever been allowed, nor any dancing or other forms of entertainment usual in clubs that have such activities as a material purpose."

The Merchants Club original resolution mentioned first the recognized need of a place where the members, more than 80 percent of whom were cotton textile merchants, could meet for the exchange of business views. One of the stated purposes of the amended charter was to establish and maintain quarters where members, their associates, clients, and business friends might obtain meals and have available private rooms suitable for business conferences. Many business conferences were held and business transacted after lunch had been served.

The Uptown Club has as its stated objective to establish, maintain, and operate a club, with a reading room and other accommodations for the use and convenience of its members. No business purpose was mentioned in the certificate. The club was not limited to nor largely made up of any one business or profession.

Substantial rentals are paid for two

[2] Army and Navy Club of America v. United States, 53 F.Supp. 277, 72 Ct.Cl. 684; Chicago Engineers' Club v. United States, 9 F.Supp. 680, 80 Ct.Cl. 615; University Club v. United States, 79 Ct.Cl. 780; Engineers' Club of Philadelphia v. United States, 42 F.Supp. 182, 95 Ct.Cl. 42; Duquesne Club v. United States, 23 F.Supp. 781, 87 Ct.Cl. 483; Duquesne Club v. Bell, 3 Cir., 127 F.2d 363, 143 A. L.R. 1377; Turks Head Club v. Broderick, D.C., 71 F.Supp. 272, affirmed 1 Cir., 166 F.2d 877.

[3] Chemists' Club v. United States, 64 Ct.Cl. 156; Houston Club v. United States, 58 F.2d 487, 74 Ct.Cl. 640; Bankers Club v. United States, 58 F.2d 503, 69 Ct.Cl. 121; Whitehall Lunch Club v. United States, 9 F.Supp. 132, 80 Ct.Cl. 350; Builders' Club v. United States, 58 F.2d 503, 74 Ct.Cl. 595; Seattle Mantle Club v. United States, 47 F.Supp. 806, 98 Ct.Cl. 562; Merchants Club v. United States, 66 F.Supp. 126, 106 Ct. Cl. 562; Squantum Ass'n v. Page, D.C., 7 F.Supp. 815, affirmed 1 Cir., 77 F. 2d 918; Town Club of St. Louis v. United States, D.C., 60 F.2d 628; Union Club of Pittsburgh v. Heiner, 3 Cir., 99 F.2d 259.

floors in the Lincoln Building in the heart of the Grand Central zone of New York City. There were 600 members, representing 20 different business and professional groups.

There are dining rooms, kitchen, refrigerating units, linen rooms, lounge, reception hall, lobby, bar, grill, ladies' dining room, reception room, powder room, etc.

There were rather elaborate furnishings. The grill and bar were furnished with leather upholstered chairs, wall seats, and tables.

Breakfasts and luncheons are served. Only a few had breakfast at the club. There are two bartenders who come on duty at 8:45 a. m., one of them leaving at 3:30 and the other at 6:00 p. m.

Luncheon is the main meal. An average of about 400 men are served lunches daily and an average of about 25 women.

No games are played on the premises. No dances are given. The club has no sleeping quarters.

We are unable to find in the record any predominant business purpose. It is true that people in the same business or profession naturally fall into conversations about their business. The lawyer will talk about the case he won, the doctor about a successful operation, the banker about an important loan and the broker about a sale he has made. It is frequently difficult to separate business from recreation. Businessmen will talk business even at a baseball game, but it would manifestly be incidental. On the other hand, those attending a board of directors' meeting might momentarily relax and have a drink or have sandwiches brought in, or engage in banter, but these diversions would also be incidental. Between these two extremes are all kinds of mingled facts flowing together, overlapping and criss-crossing, thus causing the Collector of Internal Revenue and sometimes the courts to have continuing problems. Naturally business groups had luncheon meetings where business was discussed.

But viewing the record as a whole we cannot escape the conclusion that this was a club where carefully chosen people could relax, eat, drink, visit and talk about a variety of subjects in a leisurely way under comfortable conditions, and that the social features, under the circumstances, were not only a material, but perhaps a major purpose of the club. At one of the reserved tables the representatives of one of the companies, thinking it a good idea to get away from business, fined anyone 25 cents who mentioned business, but at the end of six months they gave it up as that was about all they had to talk about.

In addition the club had reciprocal privileges with two other clubs, one in downtown New York and one in Philadelphia. Any member of the Uptown Club by presenting his card would be extended the privileges of the other two clubs, and vice versa. The evidence does not disclose what facilities the other clubs had.

The defendant discusses the decision in the case of Duquesne Club v. Bell, 3 Cir., 127 F.2d 363, 143 A.L.R. 1377. However, the facts in that case are not analogous to the case at bar. The Duquesne Club was clearly a social club and this court so held in the case Duquesne Club v. United States, 23 F.Supp. 781, 87 Ct.Cl. 483. The facts in this case are more similar to the facts in the case of Turks Head Club v. Broderick, D.C., 71 F.Supp. 272, affirmed 1 Cir., 166 F.2d 877, than to the facts in either the Duquesne or Merchant Club cases, supra.

We find that the Uptown Club had no predominant business purpose; that its social features were not incidental, but were a material part of the club's activities, and that during the period in question it was a social club within the meaning of Section 1710 of the Revenue Code.

The petition is dismissed.

MADDEN and WHITAKER, Judges, concur.

HOWELL and LITTLETON, Judges, dissent.